IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

DAVID WALLS, ET AL.                                                    PLAINTIFFS

VERSUS                                              NO. 1:17CV37-SA-DAS

HOUSTON SCH. DIST., ET AL.                                          DEFENDANTS

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

COME NOW the plaintiffs, by and through counsel of record, and file their

Memorandum in Opposition to Motion [Doc. 40] for Summary Judgment.  For cause,

the Plaintiffs show the Court as follows:

I.       STATEMENT OF FACTS

MaKayla Walls is a very devout young woman who takes the Biblical

admonishment to place God first, in all things, literally.  (M. Walls 2 Dep. at 17-18, 28.)

In the 8th grade, Makayla played the flute in the middle school band.  (Stites Dep. at

10.)  In between her 8th and 9th grade years, MaKayla tried out for the color guard and

was selected.  (Id. at 11.)  During the 9th grade, MaKayla marched with the color guard

and, after football season, played the flute in the band.  (M. Walls dep. at 15.)

MaKayla's band director was the Defendant James Napier "Jim" Stites.  (Id. at

10-11.)  MaKayla was very fond of Mr. Stites and felt that they had a special bond.  (Id.

at 14-15.)  For his part, Mr. Stites referred to MaKayla as a special student and

commended her after she first tried out for the color guard by telling her that her scores

were on par with the returning seniors.  (Id. at 13-14.)  Mr. Stites spoke highly of Makayla and told her parents that, "she can go places with that flag."  (C. Walls Dep. at 22.)

During 9th grade, Makayla encountered bullying on the practice field from other girls in the color guard.  (Id. at 25.)  The bullying appeared motivated by MaKayla removing herself from and not engaging in the sometimes vulgar and sexually explicit conversations and discussions among the other girls in the color guard.  (Id.)  Other girls on the color guard teased MaKayla for removing herself from these conversations by calling her "sheltered" and made fun of the fact that she liked to stay home and was "babied" by her parents.  (M. Walls Dep. at 20-21.)  The bullying culminated when another girl on the color guard rammed her flagpole up MaKayla's "backside."  (C. Walls Dep. at 46.)

Prior to being assaulted by her "teammate" with the flagpole, MaKayla and her mother had brought the bullying to the attention of Mr. Stites.  (Id. at 25.)  Mr. Stites was not responsive to their concerns about bullying and simply told MaKayla that she needed to work harder to be a part of the team.  (Id. at 29-30, 50-51.)

When her teammate jabbed her "backside" with the flagpole, MaKayla felt pain and was humiliated.  (M. Walls Dep. at 25.)  MaKayla then struck her assaulter on the arm with her fist.  (Id. at 26.)  MaKayla told her parents about the incident and her

mother discussed the matter with Mr. Stites who said that he would look into the matter. (Id. at 28.) MaKayla's relationship with her teammates on the color guard suffered and she did not feel a part of the team. (Id. at 28-29.)

MaKayla marched during football season and after football season she performed with the concert band. (C. Walls Dep. at 44.) It was towards the end of 9th grade that MaKayla noticed that Mr. Stites became cruel and cold towards her. (M. Walls Dep. at 30-31.) Mr. Sites acted as though he did not want to be around her. (Id. at 32-33.)

MaKayla participated in tryouts for the color guard towards the end of 9th grade. (C. Walls Dep. at 52.) After the tryouts, MaKayla learned that she was selected as an alternate member of the color guard. (M. Walls Dep. at 36.) Makayla was shocked and upset by the decision to make her an alternate and believed the scoring was incorrect. (Id. at 36-37.) MaKayla was the only rising 10th grade student not to make the team and every other girl remaining from last year's team made the team except her. (Id. at 37.) MaKayla was placed as an alternate with a 7th grader and an 8th grader. (Id.) When MaKayla asked Mr. Stites why she failed to make the team, he asked her whether she was really concerned about not making the team or not getting her way. (Id. at 39.) MaKayla felt heartbroken and devastated by Mr. Stites' response. (M. Walls Dep. at 40.)

Concerned about Mr. Stites' change in attitude towards MaKayla, her mother asked him for an explanation of the scoring. (C. Walls Dep. at 54-55.) Mr. Stites told Mrs. Walls that he did not have to explain anything to her. (Id.) Mrs. Walls felt hostility from Mr. Stites for raising questions about the process for selecting the color guard. (Id. at 55-56.) Even a meeting with Mr. Stites and the principal, Mr. James "Buzz" Boyer, regarding the selection process for the color guard failed to provide an explanation. (Id.) Much of the confusion regarding Mr. Stites' changed attitude regarding MaKayla stemmed from the fact that he had gone from being encouraging and praising regarding her talent, to openly telling her and her parents that she needed remedial help with her instrument and was "no good" and had "no talent." (Id. at 57.)

Makayla continued to be bullied and teased by her teammates on the color guard who called her talent-less for being selected as an alternate. (M. Walls Dep. at 44-46.) During the summer, prior to her 10th grade year, MaKayla, as an alternate, attended every color guard practice and the week-long band camp without missing a day. (Id. at 46-47.) At some point before the start of the football season, a member of the color guard left school creating an opening on the team. (Id. at 53.) Mr. Stites held a tryout among the alternates and selected an 8th grade student who coincidentally happened to be the daughter of a school board member. (C. Walls Dep. at 61-62.)

Mrs. Walls brought this matter to the attention of Mr. Boyer and explained to

4

him what had happened with the alternate tryout. (Boyer Dep. at 22-24.) Mr. Boyer discussed the matter with the superintendent, Mr. Tony Cook. (Id.) For his part, Mr. Cook met with Mr. Boyer and asked him to discuss the matter with Mr. Stites. (Cook Dep. at 21.) Afterwards, Mr. Cook met with Mr. Boyer again to discuss the matter and they agreed it was unfair to keep MaKayla off the color guard due to the lack of any prior ranking among the alternate color guard members. (Id.) Mr. Boyer then told Mr. Stites to put MaKayla and the other alternate on the color guard. (Boyer Dep. at 25-26.) Both Mr. Boyer and Mr. Cook agreed that Mr. Stites was not happy about being instructed to put MaKayla on the color guard. (Cook Dep. at 24; Boyer Dep. at 34.) After MaKayla was placed back on the color guard by the administration, Mrs. Walls hoped everything could be put behind them and everyone would have a good year. (C. Walls Dep. at 75.)

As a requirement to participate in the band during 10th grade, Makayla and a parent were required to sign a band handbook. (Id. at 79.) Mrs. Walls discussed the handbook and its requirements with MaKayla. (Id. at 80-81.) The main requirement for participation in the band was attendance at practices and performances. (Id. at 82.) Mrs. Walls agreed with the attendance policy but did not consider the attendance policy was more important than religious worship. (Id. at 84.) For her part, Mrs. Walls made every effort to have MaKayla at every practice. (C. Walls Dep. at 85.)

Unlike the Houston School District ("HSD") Handbook which expressly mentioned religious worship as a basis for an excused absence, the band handbook and request for excused absence form prepared by Mr. Stites made no mention of religious worship as a basis for an excused absence. (Cook Dep. at 57-58.) Mr. Cook did not believe the band program was subject to the requirements of the HSD Handbook and he vested Mr. Stites and other directors of extracurricular activities with complete discretion to run their programs as they saw fit. (Id. at 58-62.) Contradicting Mr. Cook, Mr. Stites stated his band program was fully subject to the HSD Handbook requirement that religious observance constitute a basis for an excused absence, as a way of explaining his failure to include religious observance in the Band Handbook or the request for excused absence form. (Stites Dep. at 62-65.)

The Walls family attended the Bruce Church of Christ. (C. Walls Dep. at 10-11.) Due to the illness of the scheduled speaker, for the summer revival at church, it was forced to reschedule the revival. (Id. at 86-87.) In order to have the revival, the church found a different speaker for every night of the week and ultimately scheduled it for the late summer after school started. (Id.) Of seminal importance to this case, the revival took place from August 23, 2015 until August 28, 2015. (M. Walls Dep. at 18.)

MaKayla performed at the first football game of the season against Pontotoc High School, on August 21, 2015. (Id. at 6, 8.) Anticipating the scheduling conflict

between their prayer meeting and the football game scheduled for August 28, 2015, Mrs. Walls filled out a request for excused absence form, for a "gospel meeting," and signed it on August 19, 2015. (C. Walls Dep. at 86.) Mrs. Walls then gave the excuse form to MaKayla and told her to sign it and give it to Mr. Stites. (Id. at 90.) MaKayla gave the excuse form to Mr. Stites that day but forgot to sign it. (M. Walls 2 Dep. at 14-15.) No documentation was attached to the excuse form because none was available, as church had not printed any materials regarding the rescheduled gospel meeting. (M. Walls 2 Dep. at 17; C. Walls Dep. at 89, 123-24.)

MaKayla handed the excuse form to Mr. Stites. (M. Walls Dep. at 14.) Mr. Stites told MaKayla that he appreciated it. (Id.) Mr. Stites never told MaKayla that she needed to sign the excuse form or provide documentation to act on or approve her request to be excused from the band performance. (Id. at 14-17.) Between the time she handed the excuse form to Mr. Stites and the day of the gospel meeting and football game, MaKyla asked whether he had approved the request but never received a response. (C. Walls Dep. at 90.) However, on August 28, 2015, the day of the gospel meeting and the game, MaKayla reminded Mr. Stites during band class that she was going to attend her gospel meeting that evening and offered to go to the game afterwards if he wanted. (M. Walls Dep. at 15-16.) Mr. Stites told MaKayla to go on to her gospel meeting and have fun. (Id. at 15-16, 29)

For her part, Mrs. Walls, concerned about not having received written confirmation whether or not MaKayla's request to be excused from the Calhoun City game performance would be approved spoke with Mr. Stites about the planned absence. (C. Walls Dep. at 89.) Mrs. Walls asked Mr. Stites if she should bring MaKayla to the game after the gospel meeting. (Id.) Mr. Stites told Mrs. Walls there was no need that she do so. (Id. at 89, 92.) Neither Mr. Stites nor anyone else ever mentioned any problem with the excuse form to Mrs. Walls. (Id. at 101.)

During the week of the revival MaKayla attended every night of the gospel meeting. (Id. at 91-92.) MaKayla also attended every practice that week and once had to go directly from an after school practice and rush home to change clothes before going to church. (C. Walls at 91-92.) MaKayla viewed missing the gospel meeting as a betrayal of the Lord. (M. Walls Dep. at 17-18.) There was no chance MaKayla would go to the band performance over the gospel meeting and would have gone to the gospel meeting even if Mr. Stites had refused her request for an excused absence. (Id. at 30.) MaKayla understood being committed to what you do but she put her Lord and family first. (Id. at 28-29.) Consistent with her religious beliefs, on August 28, 2015, MaKayla attended the gospel meeting at her church instead of attending the Calhoun City football game and performing with the color guard. (Id. at 52.)

After MaKayla missed the game, Mr. Stites contacted Mr. Cook by e-mail to

inform him that MaKayla had missed a practice on Thursday and a performance on Friday and that both absences were not excused. (Cook Dep. at 29-32.) In his e-mail to Mr. Cook, Mr. Stites failed to mention that MaKayla had submitted a timely request to have her absence excused because she was attending a worship service. (Id. at 33.) After receiving the e-mail from Mr. Stites, Mr. Cook met with Mr. Boyer and was informed that Mr. Stites was dismissing MaKayla from the band because her absences were not excused and MaKayla failed to follow procedure to have her absences excused. (Id. at 33-34.) Mr. Cook told Mr. Boyer that this matter had to be thoroughly discussed and had a follow-up with meeting with both of them. (Id. at 34-35.) At the follow-up meeting, Mr. Stites was adamant that procedure had not been followed and that the absences were not excused. (Id. at 35.)

According to Mr. Boyer, Mr. Stites approached him after the Calhoun City game and told him that he was removing MaKayla from the band for missing a performance which was not excused. (Boyer Dep. at 37.) Mr. Boyer urged caution because he knew, "it would hit the fan," and told Mr. Stites that we need to think about this and involve Mr. Cook. (Id. at 40-41.) At the meeting between the three of them, Mr. Stites stated that MaKayla had not followed procedure and missed a performance which was not excused. (Id. at 43-44.) Mr. Stites was told to think about the matter for a few days before making a decision to remove MaKayla from the band. (Id.)

9

In meeting with Mr. Cook and Mr. Boyer, Mr. Stites never explained which procedure MaKayla had failed to follow, why she missed the band performance, or that she had requested in writing the absence for the gospel meeting be excused. (Id. at 44-49.) Mr. Stites failed to show Mr. Boyer or Mr. Cook the request for absence form filled out by Mrs. Walls and failed to tell either of them that MaKayla missed the performance because of a worship service. (Boyer Dep. at 49-55.) Mr. Boyer expected the excuse form would be brought to the meeting by Mr. Stites and that he would be informed why MaKayla missed the performance. (Id. at 51-55.)

Several days after the meeting, Mr. Stites informed Mr. Boyer that he still wanted MaKayla removed from the band. (Id. at 57.) Because this decision was made close in time to the next football game against Okolona, Mr. Boyer told Mr. Stites to allow her to perform with the color guard at that game. (Id. at 57-59.) At the time the decision was made to remove MaKayla from the band, Mr. Cook and Mr. Boyer delegated the authority to dismiss her to Mr. Stites and told him that he would have to live with the consequences of that decision. (Cook Dep. at 37; Boyer Dep. at 48-49, 54.) Neither Mr. Cook nor Mr. Boyer knew that Mrs. Walls had requested, in writing, that Mr. Stites excuse MaKayla from performing at the Calhoun City game on account of a worship service. (Cook Dep. at 44-46; Boyer Dep. at 55, 57-59.)

Once Mr. Stites made the decision to remove MaKayla from the band, Mr. Boyer

contacted her parents and informed them of the decision. (Boyer Dep. at 60-62.) Mr. Boyer met with Mrs. Walls and was surprised to learn for the first time that she thought the absence had been excused since it was for a gospel meeting. (Id. 61-62.) Mr. Boyer wished he knew that information prior to meeting with Mrs. Walls but viewed it as Mr. Stites' policy to enforce. (Id. at 62-63.)

Mrs. Walls was shocked to hear that MaKayla had been removed from the band and asked to be allowed to break the news to MaKayla. (Id. at 63-64.) MaKayla was called out of class and was told about the decision to remove her from the band by her parents. (C. Walls Dep. at 98-99.) Mrs. Walls had no inkling that MaKayla was going to be removed from the band until she received the news from Mr. Boyer. (Id. at 100.)

After receiving the news from Mr. Boyer regarding MaKayla's dismissal from the color guard, Mr. Walls and Mrs. Walls met with Mr. Cook. (Cook Dep. at 39-41.) Mr. Cook was pressed for time and said this to MaKayla's parents. (Id. at 38.) At this meeting, Mr. Cook told MaKayla's parents that he would have a problem with it if one of his ball players missed a game to go to church. (C. Walls Dep. at 71-72.) During this meeting Mr. Cook heard for the first time that Mrs. Walls requested that MaKayla's absence be excused and thought it would be excused as a religious observance. (Cook Dep. at 42-43.) Mr. Cook also learned that Mrs. Walls had actually filled out a request form prior to MaKayla missing the performance. (Id. at 44-46.)

11

In meeting with the administration regarding Mr. Stites' decision to dismiss MaKayla from the color guard, the administrators never attempted to justify her dismissal based on the fact the request form was not signed by MaKayla or lacked documentation. (C. Walls Dep. at 101.) Mrs. Walls was told that MaKayla's dismissal from the band was because she missed the performance at the game and went to the gospel meeting. (Id. at 101-02.)

Much like Mr. Cook, Mr. Boyer would have been disappointed in a player going to a gospel meeting over playing. (Boyer Dep. at 84-86.) However, Mr. Boyer believed that Mr. Stites should have listed religious observance as a reason for an excused absence on his excuse form. (Id. at 86-87.) Mr. Boyer was unaware of any other student who was ever removed from a program because they had attended a religious activity. (Id. at 88.) Mr. Boyer admitted that MaKayla's gospel meeting constituted a religious activity and acknowledged that a school district could not get involved in parsing an individual's personal faith. (Id. at 88-89.) Mr. Stites never told Mr. Boyer what policy or procedure MaKayla had failed to abide by in dismissing her from the color guard. (Id. at 90-91.) Mr. Boyer felt that Mr. Stites did not follow his own procedures by failing to note whether or not the request for an excused absence by MaKayla was excused or not excused. Mr. Boyer believed that Mr. Stites should have informed MaKayla that her absence would be unexcused before dismissing her from the band program. (Boyer

Dep. at 92-94.)

Mr. Stites' failure to follow procedure, according to Mr. Boyer prevented the administration from addressing the matter prior to Makayla's removal from the band. (Id. at 94-96.)  Ultimately, Mr. Boyer believed that if you expect others to follow procedure you should follow procedure.  (Id. at 96.)  Mr. Boyer would not have ignored MaKayla's request for an excused absence because she had not signed it or failed to indicate to her whether or not the request was allowed.  (Id. at 98.)  Mr. Boyer would consider it wrong for Mr. Stites to say that MaKayla could go to the gospel meeting then remove her from the program for going.  (Id. at 99.)

According to the superintendent Mr. Cook, the religious reason MaKayla missed the performance was *irrelevant* and he upheld Mr. Stites' decision to remove MaKayla from the band due to what he called a lack of following procedure.  (Cook Dep. at 44.) However, Mr. Cook acknowledged that Mr. Stites had failed to follow procedure by not noting on the excuse form whether it was approved or denied, and admitted that Mr. Stites had an obligation to inform MaKayla the excuse form was not properly filled out so that she could fix it, in plenty of time before the event.  (Id. at 53-54.)  Ultimately, Mr. Cook upheld Mr. Stites' decision because, as the band director, he had full discretion in running the band program.  (Id. at 58.)

Aside from being dismissed from the band program for attending a worship

service, MaKayla was subjected to more than one browbeating from Mr. Stites who told her that she was "worthless," "talent-less," "no good," "never going to be any good," "never be anything in life," and "worthless in life." (M. Walls 2 Dep. at 31-32.) MaKayla was bullied and mocked for being dismissed from the band and told it was her own fault. (Id. at 27.)

Mrs. Walls appeared before the HSD Board of Trustees on two occasions to seek Makayla's reinstatement to the band program. (C. Walls Dep. at 100.) Mrs. Walls told the Board that she considered it sad that a child who wanted to worship could not do so and continue to enjoy the band. (Id.) The only reason given to Mrs. Walls, at the Board meetings she attended, for MaKayla's dismissal was that MaKayla missed a performance to attend a gospel meeting. (Id. at 100-102.) There was no mention to her that the excuse form not being filled out correctly was the reason for MaKayla's dismissal from the band. (Id. at 101.)

Once dismissed from the band, MaKayla began taking music lessons with Mr. David East. (C. Walls Dep. at 93.) Makayla was referred to Mr. East because of Mr. Stites' claims that she was deficient, in order to evaluate her, and keep her prepared to participate in 11th grade band. (Id. at 93-94.) Mr. East's evaluation showed Makayla was not behind and she began once a week lessons in order to be prepared for the following year. (Id. at 94-96.) Ultimately, due to her maltreatment, in the HSD,

14

Makayla transferred to Bruce where she had a good experience and participated in the marching band in the 11th grade and was a member of the color guard and concert band as a senior. (Id. at 116.) Today, MaKayla attends Northeast Mississippi Community College where she receives a scholarship, as a member of the color guard. (Id. at 117-18.)

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual " issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party," and "'material' if its resolution could affect the outcome of the action." Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc., 482 F.3d 408, 411 (5th Cir. 2007). In reviewing a summary judgment, all facts and inferences must be construed in the light most favorable to the non-moving party. Burrell, 482 F.3d at 411.

The party seeking summary judgment carries the burden of demonstrating that there is no evidence to support the nonmovant's case. " Hirras v. National R.R. Passenger Corp., 95 F.3d 396, 399 (5th Cir. 1996) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). In ruling on a motion for summary judgment, the court is not to make credibility determinations, weigh evidence, or draw from the facts legitimate inferences

15

for the movant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Rather, the

evidence of the nonmovant is to be believed, and all justifiable inferences are to be

drawn in his favor.  Anderson, 477 U.S. at 255. A "court should give credence to the

evidence favoring the nonmovant as well as that evidence supporting the moving party

that is uncontradicted and unimpeached, at least to the extent that that evidence comes

from disinterested witnesses".  Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133,

151 (2000).

In addition, "[s]ummary judgment should be used 'most sparingly in . . . First

Amendment case[s] involving delicate constitutional rights, complex fact situations,

disputed testimony and questionable credibilities."  Benningfield v. City of Houston,

157 F.3d 369, 377 (5th Cir. 1998) (quoting Porter v. Califano, 592 F.2d 770, 778 (5th Cir.

1979)).

## III.   ARGUMENT AND AUTHORITIES

In their memorandum of law, the Defendants contend that they are entitled to

summary judgment for myriad reasons.  In so doing, the Defendants disregard the

controlling summary judgment standard which compels this Court to view the evidence

in the record in the light most favorable to the nonmoving party.  Instead, the

Defendants provide an incomplete and hopeful version of the facts which ignores a

summary judgment record rife with their own cruelty, self-contradiction, and

16

mendacity. Ultimately, when the evidence adduced by the Walls family and supported by the summary judgment record is considered the conclusion is inescapable that genuine issues of material fact preclude the very relief sought by these Defendants.

     A.    These Defendants Violated The Free Exercise Clause Of the First Amendment By Expelling MaKayla Walls From The Band Program For Attending A Worship Service.

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. It is with respect to the latter prohibition, on the limitation of free exercise of religion, that we spar over in this civil action. The Defendants want this Court to focus on the activity and the relative importance of that activity in society and as interpreted by the courts as a right or privilege. Such a focus misses the point of this entire case. The seminal issue in this case is not the activity MaKayla was engaged in (color guard or band) but her religious sensibilities and the right to be free from government sanction for worshiping as she sees right and proper.

The First Amendment applies to school districts as political subdivisions of the state through the Fourteenth Amendment. <u>Engel v. Vitale</u>, 370 U.S. 421 (1962). Where the government sanctions the expression of religious belief, as in this civil action, the free exercise clause is implicated and imposes a restriction on the challenged governmental action. <u>Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah</u>, 508

U.S. 520, 532 (1993). Under the free exercise clause, the government may, however, adopt and apply neutral, generally applicable laws and practices. Employment Div., Dep't of Human Resources of Or. v. Smith, 494 U.S. 872, 878-79 (1990).

Though the Defendants assert that the expulsion of Makayla from the band was the result of the application of a neutral policy requiring properly filled out paperwork, to miss a band performance, the summary judgment record supports the Plaintiffs' conclusion that MaKayla's participation in the worship service was the cause of her expulsion from the color guard and band and was not based upon the application of a facially neutral policy of general applicability.

First, the band handbook and request form specifically excluded religious worship as a basis for an excused absence contrary to the HSD Handbook. As noted by the superintendent, the HSD handbook policy allowing excused absences for religious worship was not applicable to the band program. As noted by Mr. Boyer, until MaKayla's removal from the color guard and band based on Mr. Stites' band handbook attendance policy, no other student had ever been dismissed from a program due to participation in a religious worship service over a school activity. In addition, the band handbook attendance policy listed several bases for an excused absence but omitted religious worship as one of those bases.

Second, the administrators responsible for supervising the application of the

18

policy both admitted that as coaches they would disapprove if one of their athletes had chosen to attend a religious worship service in lieu of playing in a ball game. These candid admissions manifest hostility to religious worship over school activities by the very individuals responsible to oversee the band handbook attendance policy.

Third, the justification proffered by the Defendants before this Court, for dismissing MaKayla from the band, were never stated to Mrs. Walls, at the time, as the reason for her dismissal from the color guard. All Mrs. Walls was told at the time was that Makayla's dismissal from the color guard and band was because she attended a gospel meeting and not a half-time color guard performance at a high school football game. The shifting reason given to Mrs. Walls for Makayla's dismissal from the band permits an inference that the proffered reason is a fabrication. As in the employment context where an employers shifting reasons for terminating an employee can serve as evidence of pretext, such a change in the reason the Defendants took their adverse action against the Plaintiffs can serve as evidence of improper motive towards religious practice. See Appelbaum v. Milwaukee Metropolitan Sewarage Dist., 340 F.3d 573, 579 (7th Cir. 2003).

Fourth, Mr. Stites purposely misled his administrators by failing to inform them that Mrs. Walls had requested, in writing, that Makayla's absence to attend a religious service be excused. Further, Mr. Stites never told his administrators prior to dismissing

her from the color guard and band that Makayla's absence was on account of her attendance at a religious worship service. Such a deliberate failure to provide truthful information to his administrators prior to dismissing MaKayla manifests and evidences arguable hostility to her religious practice.

Finally and most telling, Mr. Stites specifically told MaKayla to go to her worship service and, "have fun." Then, he turned right around and dismissed MaKayla from the color guard and band for attending the very same religious service he told her she could go to. In so doing, he never noted on the excuse form given to him by MaKayla whether or not her request for an excused absence to attend a religious service was approved or disapproved. The failure of Mr. Stites to process the request for excused absence in accordance with the policy compounds the arbitrariness of the policy in its form and application and highlights the hostility towards MaKayla's religious practice harbored by Mr. Stites.

Contrary the the Defendants' assertions, the band handbook policy created by and administered by Mr. Stites bears no resemblance to the legislatively esablished policy which passed constitutional muster in Smith. Instead, the facially hostile and arbitrarily enforced policy at issue in this case cannot pass muster as it substantially burdened the Plaintiffs religion without any corresponding compelling governmental interest. The application of the band handbook policy to the Plaintiffs in this case was

20

not neutral but deliberately arbitrary and hostile to their religious belief system.

Given the presence of genuine issues of material fact the Defendants cannot demonstrate as a matter of law that their actions were free from constitutional infirmity. The Defendants' request for summary judgment on the ground that no First Amendment constitutional violation occurred should be denied.

B.      These Defendants Violated The Mississippi Religious Feedom Restoration Act ("MRFRA") By Expelling MaKayla Walls From The Band Program For Attending A Worship Service.

The MRFRA places a heightened burden on governmental entities, such as the HSD, when their policies and the implementation of their policies substantially burden an individual's religious practice without a compelling governmental interest achieved through the least restrictive means possible.  See Miss. Code Ann § 11-61-1(5)(b).  By its very terms the MRFRA applies to the HSD as a governmental entity and its application of a policy which burdened the Plaintiffs' religious practice falls within the letter of the statute.

The Defendants make the same arguments in support of the dismissal of the Plaintiffs' federal claims to support the dismissal of their claims under the heightened standard they must meet under the MRFRA.  Stated succinctly, the Defendant cannot meet their burden to establish an entitlement to summary judgment in light of the evidentiary record before this court.  Whether the band handbook policy does or does

21

not burden the Plaintiffs' right to free exercise (the Plaintiffs contend it does) is not the primary question before this Court. The primary question is whether the Defendants application of that policy burdened the Plaintiffs' religious exercise. On this record, the answer is a resounding, yes.

MaKayla complied with the policy requirements of the HSD by submitting a timely request to be accommodated by allowing her to miss one performance in order to attend a religious worship service she viewed as absolutely necessary for her to attend. Whatever, complaints the Defendants raise about the paperwork are muffled by the Defendants' utter failure to abide by their own policy and to enforce their policy in a manner that did not substantially burden her religious exercise.

As noted above the Defendants' application of its band handbook policy involved overt hostility to religious practice where it conflicted with school extracurricular activities by the administrators responsible for overseeing the policy,the express rejection of religious practice as a ground to excuse an absence, the failure of the Defendants to abide by their own policy, and the dishonest application of the policy towards the Plaintiffs. Taken as a whole these specific factors, spelled out in factual detail above show that the Defendants retaliated against a teenaged girl because she attended a worship service she was compelled to attend based on her faith instead of adhering to the secular quasi-religious orthodoxy of Friday night football.

No cogent argument can be made as to how these Defendants are entitled to summary judgment, for dismissing a child from a band program because she attended a worship service, under the heightened standard set by the MRFRA. The Defendants' request for summary judgment as to the Plaintiffs' claim under the MRFRA should be denied.

Neither the Defendant Stites Nor the Defendant

C.     The Plaintiffs Confess Their Federal Individual Capacity Claims Against Mr. Stites And Mr. Cook.

The Plaintiffs confess their federal individual capacity claims as to Mr. Stites and Mr. Cook and consent to the entry of a judgment of dismissal as to those claims.

IV.     CONCLUSION

For the reasons stated above, the Plaintiffs request that the Defendants' Motion for Summary Judgment be denied as to their claims for federal and state law violations against the HSD.

Respectfully submitted, this the 24th day of September, 2018.

/s/ Victor Israel Fleitas

_____

        VICTOR I. FLEITAS
        MS BAR NO. 10259

Victor I. Fleitas, P.A.
452 North Spring Street
Tupelo, MS 38804
662.840.0270 / Phone
662.840.1047 / Facsimile
fleitasv@bellsouth.net / Email

Attorney for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2018 I electronically filed the foregoing

with the Clerk of the Court using the ECF system which sent notification of such filing

to the following:

Randall E. Day, III, Esq.
Mitchell Day Law Firm
618 Crescent Boulevard, Suite 203
Ridgeland, Mississippi 39157
rday@mitchellday.com

This the 24th day of September, 2018.

/s/ Victor Israel Fleitas

_____
VICTOR I. FLEITAS